May it please the Court, I'm Ray Warrens and I represent General Construction Company and its insurer in this Longshore Act Federal Workers' Compensation Act case, Mr. Castro v. General Construction Company. I would like to reserve five minutes of my time, if I may, for rebuttal. This is a case where Mr. Castro had a right knee injury. He was paid temporary total disability compensation during the time that he was off of work and ultimately paid a permanent partial disability award upon the finding of medical stability and employability through means of a labor market survey. Labor market surveys were performed in this case both before and after the date of maximum medical improvement and it is uncontroverted in this case that Mr. Castro was found to be capable of performing alternative employment to his former employment with my client through means of a labor market survey. This was concluded by a number of doctors, by the vocational consultants, by the Administrative Law Judge and by the Benefits Review Board. What is the point of that contention? Does it matter? Are you saying that he wasn't entitled to rehabilitation? I'm not saying he wasn't entitled to rehabilitation, Your Honor. It's long been in Section 39 in the Act that an individual who qualifies for rehabilitation may be rehabilitated by direction of the district director. What is at issue in this case is whether an individual is entitled to receive permanent total disability compensation during that rehabilitation if they have a performance of the labor market survey. The labor market survey establishes employability. Now, scheduled injuries are, there's two types of permanent disability under the Longshore Act. There's disability for so-called scheduled injuries, those body parts that are contained within the schedule. I don't understand why we're concerned with it. The question is whether he was entitled to total disability payment during rehabilitation. The distinction is important, Your Honor, because the United States Supreme Court in the 1980 opinion of PEPCO, which was a scheduled injury case, looked at whether there was any type of permanent disability available to a scheduled injury claimant beyond what was contained in the schedule itself, the number of weeks they're entitled to, and concluded they were not, that the statute was constrained to its terms, that the claimant is limited to the permanent partial award once employability was shown. Employability was shown through a labor market survey. No court of appeals in this country has ever awarded what is sought in this case. That's permanent total disability during rehabilitation for a person with a scheduled injury to a body part. Is that how you distinguish the Abbott case? Yes, sir. The Abbott case and the Brickhouse case were both non-scheduled injuries. They're both back injury cases. The foundation that the Director is here to argue for the Department of Labor, and he cobbles together a statutory argument for the proposition that permanent total disability is available during rehabilitation, and the foundation statute within his argument is Section 8H of the Act. Now, in his brief, he cites Section 8H, and he talks about … Counsel, before we go there, is it your position that during vocational rehabilitation, no benefits are payable? Is that your argument? The statute provides a $25 per week maintenance fee to be paid out of a special fund for individuals at the discretion of the district director who are in rehabilitation. So your argument is beyond that $25, injured longshoremen are not entitled to any additional benefits while undergoing vocational rehabilitation? Yes, Your Honor, and especially in the situation of a scheduled injury case. But even if it's not a scheduled injury, your position is no one is entitled to payment of disability benefits beyond the $25 while undergoing vocational rehab? If employability has otherwise been shown as it was here, no, they're not. And what has traditionally taken place under the Longshore Act has been a situation where the employers often voluntarily pay the compensation during vocational rehabilitation. The compensation is paid because it's in an unscheduled injury case, which unlike the schedule, pays the person their loss of wagering capacity. It's certainly within the employer's interest to promote the employability of the claimant, and often they will even set up a vocational rehabilitation program of their own to pay them the compensation. You'll have to explain to me why it makes a difference for purposes of the compensation paid during rehabilitation that it was a scheduled injury. Well, I would point the Court to the Pepco case from 1980, which was cited both by the director and by us, and for their very clear language on how the schedule, permanent compensation of disability for the schedule injuries, is limited to the schedule itself. But is that a vocational rehabilitation case? Is that the context in which it arose in the Pepco case? It is not. The context that arose in the Pepco case was the claimant was seeking an alternative to the schedule. He had a knee injury, just like Mr. Castro, and he was seeking loss of wagering capacity, permanent partial disability, under Section 8C21 as an alternative to what was contained in the schedule. And previously, the Benefits Review Board had allowed claimants to opt for one or the other. And the U.S. Supreme Court said, no, you can't do that. It's one, it is that one remedy that's available for a scheduled injury. But that was not in the context of vocational rehab, so it doesn't directly address the issue we are charged with deciding here. It directly addresses the issue in that the Court tells us what is available. And I will quote from the case. I'm sorry, I have the Westlaw version of the case. I believe it's ‑‑ I can pull it out of a citation in my brief, if you like. This is 101 S.C.T. at 512. The language of the Act plainly supports the view that the character of the disability determines the method of compensation. In permanent partial disability category, Section 8C provides a compensation schedule. There is no language in that additional paragraph in that Section 8C21 indicating that it was intended to provide an alternative method of compensation for cases described in the preceding paragraph. Partial disability. You're talking about partial disability. Yes. Well, the Court was dealing with whether permanent partial disability, as I said in the previous case, or Section 8C21 was available for a ‑‑ But how does that relate to temporary total disability during rehabilitation? What was not awarded was ‑‑ temporary total disability was not awarded in this case. Permanent total disability was awarded in this case. PEPCO makes clear that the only permanent disability available to a scheduled injury claimant is the schedule once employability has been shown. And in this case, the Administrative Law Judge and the Benefits Review Board agree that we demonstrated suitable alternative employment through our labor market surveys even before the vocational program was instituted by the OWCP. So wasn't PEPCO saying if you have a section of a statute that delineates specific injuries, you can't go ‑‑ if you have one of those injuries, you can't go to a catchall provision and get benefits under that catchall provision. Isn't that basically what PEPCO was saying? PEPCO was saying that the statute is limited by its terms. And it talks about how section ‑‑ how the schedule can be unfair. Now, there are times when the schedule is more than fair. That portion you read, isn't that a fair characterization of what that ‑‑ of that discussion? I believe that it is a partial fair characterization. I believe that the court is clearly telling us that there is only one type of remedy available for these types of claimants. And they look to the statutory history. And the statutory history did not provide an alternative remedy to the schedule in the PEPCO case. Likewise, in our case. And in 1980, the Supreme Court said Congress ‑‑ How much are you relying upon to say that the Supreme Court clearly said that there is only one statutory remedy? The use of schedule of ‑‑ the schedule of fixed benefits as an exclusive remedy in certain cases is consistent with the employer's interest in receiving a prompt in certain recovery for the employee's interest, receiving a prompt in certain recovery for their industrial injury, as well as the employer's interest in having their contingent liabilities identified as precisely and early as possible. That's a clear statement that there is only one remedy under the statute? Exclusive remedy are the words used by the U.S. Supreme Court. And the U.S. Supreme Court encouraged the Congress, when they amended the act, and this was 1980, to fix it, to make the schedule perhaps more generous or in some way more fair. And Congress did not. All they did was add a provision on hearing loss, which has nothing to do with our knee injury here, which is considered a leg disability under the schedule. Congress did consider two separate provisions or two proposed laws which would have provided total disability during rehabilitation in addition to a permanent partial disability award. This is a different issue that you're shifting to, right, from what you talked about at the beginning about the limitations on scheduled injury? It's the same issue in the sense that Congress, in 1983, when it was about to amend the Long Shore Act, considered provisions which would have added the exact remedy which the courts have imposed since Abbott. And that is the argument that Abbott rejected, right? Actually, this is the first case that I know of where the statutory history has been so The statutory history in this case, as delineated in our brief and the amicus brief, is utterly consistent with the remedy that's been afforded here. The statutory history shows that a type of the same type of remedy was proposed, but rejected by Congress. Well, it was not adopted, but it wasn't rejected, right? The amendment was rejected, but the statute didn't provide that you couldn't award that remedy. And admittedly, Your Honor, there are, and the Director has argued that the failure of Congress to adopt a provision sometimes is viewed as not statutory history, but the Supreme Court has acknowledged that sometimes they look to Congress's failure to adopt a provision. In the context of our case, the Supreme Court directed Congress to fix the schedule in 1980. They did not, and in fact, they specifically did not adopt provisions which would have provided an additional benefit to persons such as Mr. Castro of rehab, of disability compensation during rehabilitation. Hasn't the interpretation that's urged, that was adopted in this case, been one that's been in effect for 10 years and applied in numerous cases? It's been in effect for 10 years in the sense that an isolated case, the Abbott case in any, I should say, scale in that case, it was a side issue which I believe the defense actually ignored. That case stood alone, and then as later in time, the Brickhouse case But the Director has been following in that case for about 10 years, right? The Director in the last few years has been applying the Abbott to afford temporary total during rehab. What I asked the Court to do is look very carefully at the Pepco case and its reasoning and the statutory history, and you'll see that the limitation of Abbott and Brickhouse is unscheduled disability cases. Those are the cases where you look into what can be, look into the future wagering capacity of the individual where fairness enters into the whole calculation. The U.S. Supreme Court was concerned in 1980 in Pepco that the fairness was not there and they directed Congress to correct it, and they simply did not. In fact, in the statutory history, it's clear that they rejected the correction, a correction that the Supreme Court had directed to them. The Director here is not entitled to do deference on this. The Director is entitled to deference in the Benefits Review Board only if their position is consistent with the statute. And in this case, they cobbled together, as I say, three different parts of the Act for a proposition that doesn't exist within the Act. This is a fifth form of recovery that didn't exist before. And Section 8H is the key. And take a look at 8H because that's the foundation for Brickhouse and Abbott and their argument. Take a look at it and you'll see that 8H by its terms applies only to Section 8C21 type of injuries, and those are unscheduled injuries. That's the key distinction in this case. And I would ask the Court to consider that very closely because this is the first time that this issue has ever been presented to a court of appeals. I see that I'm close to my five minutes. Does the Court have any more questions? It appears not. Thank you, Counselor. Counselor, do you all intend to share your time? Yes, Your Honor. We're going to split time evenly. Thank you. All right. Just put 10 minutes on, please. I'm Bill Hochberg. I represent Mr. Castro, the injured worker. It's a pleasure to be here this morning. We ask that this Court affirm what the administrative law judge, the Board, has done in this matter, support the district directors and the directors' interpretation, follow the law of other circuits and your own circuit in terms of average weekly wage, and order fees and costs to be paid on behalf of Mr. Castro if he prevails in this matter. Will you address the argument concerning the unscheduled versus scheduled injuries? I think the bottom line is a very simple one, and that is, yes, there is a difference. I mean, there's no question. Under the Law Ensure Act, there's differences between unscheduled awards and scheduled awards. But in the context of vocational rehabilitation, trying to get someone back to close to what their wage earning capacity was and allowing vocational rehabilitation, it shouldn't matter, because the bottom line goals of getting individuals back to work are the same. We want to try to restore their earning power. In Mr. Castro's case, without vocational rehabilitation, he could have gone back as a security guard. That's true. But I don't think that's the question. The question isn't whether he's going to get vocational rehabilitation. The question is the rate at which he'll be compensated while he's getting it. And counsel argues that he's only entitled to compensation for a scheduled injury because that's what it was. Now, what's wrong with that argument? Well, what's wrong with it is that, as in this case, Mr. Castro really and others can't survive under those circumstances not to do vocational rehabilitation. But does that matter if the statute specifically prohibits going outside the scheduled injury allocation? Does it matter, you know, whether or not it's a hardship to the injured worker? If that's what Congress said and it's clear, we can't consider the hardship, can we? Well, I think number one, the question is whether Congress made that clear. That's obviously not what the Abbott court or the Berkhouse court has said or what the district director says. But you said Abbott was a non-scheduled injury and this is a scheduled injury. Correct. Well, is that a correct distinction? It's a distinction. I'm not sure it's a distinction with the difference. Why not? Because really what we want to do is we want to get these injured workers back, restored with earning power. That is, in fact, part of the act. It's quite clear that one of the act's goal is to rehabilitate injured workers. Counsel, would you address in PEPCO the language that opposing counsel read that said the scheduled injury award is the exclusive mechanism for compensating an injured worker who has a scheduled injury? What's your response to that? Well, I think that's true once at least it's true to some extent to the situation where, in fact, someone has a scheduled award and that scheduled award needs to be paid vis-a-vis whether or not you try to use it as an unscheduled manner. The factual circumstances in PEPCO were totally different than what the situation is here. Here we have really not only a physical situation in terms of what Mr. Castro's physical disability was, but also economic considerations to the extent that if he's in a vocational rehabilitation program, we know that he cannot do other things at the same time. The economic considerations are such that he cannot go back and do these other jobs that the employer has identified. In your view, are there any limitations to the approval of a vocational rehabilitation program? Absolutely. What are those? Those are what are precisely outlined in AVID and supported by the Benefits Review Board and what was found appropriate in this case. Specifically, if you're in a vocational program, is that precluding other employment? That's what happened here. What's the employer's view of it? I mean, there certainly are vocational programs that employers do, in fact, agree with. There are vocational programs that are short duration that the employer really has very little interest in. Also, there are situations, and this is, I think, important from a standpoint of permanent disability, you could start a vocational program without being at maximum medical improvement. In this case, that wasn't the situation. That's why it was permanent total disability benefits, not temporary total disability benefits. What about the secretary's directive that the training programs be in anticipation of a short, realistic, attainable vocational objective terminating in remunerative employment? Do you think that objective was met in this case? Those are two different issues. I think that was met in this case. Certainly the secretary has the opportunity to make that determination, or the district director specifically in this case, as to whether or not the vocational program met Mr. Castro's need. I think it did, because clearly ‑‑ Not just meeting his need, that it has to be in anticipation of short, realistic. Was that consideration incorporated into this rehab program? From my standpoint, the answer is yes. Clearly Carol Williams, the vocational counselor, had the charge of trying to find a program that met Mr. Castro's need, approved then by the district director. But it also has to be consistent with the act, not just Mr. Castro's needs, but it also has to be consistent with the act and not just consider the worker's need as opposed to the act's goal of having a short, relatively short period of time for someone to be retrained and redirected into a different vocation. Well, and I guess it all gets down to what the definition of short is. Is a two‑year program a short program? I think that's a relatively short program. A long program, maybe that's a four‑year program. Certainly I think we probably all agree that a six‑month program is a short program. Two years, I think that's probably a pretty average vocational program. That's two years in a community college. That seems rather reasonable, and in this case was the way to maximize his retaining wage earning capacity to get him close to what he was at the time of injury. If we were to agree with the argument that this was a scheduled injury, he still would be entitled, I take it, to compensation for disability during vocational training, but it would be a lesser amount, is that right? It would be a different amount. A lesser? It would be based on his average weekly wage. So the issue here is whether he was getting too much, not whether he should be getting anything. Well, the only thing he would get would be the $25 maintenance award from the secretary, and I don't think anyone in this room is going to say that you can live on $25 a week and go to school. If he has a scheduled injury, wouldn't he be getting the amount of compensation? Right, and that could be a much shorter time period. No, that's different. He would be getting more than $25, would he not? That's true. So you said $25, but that's not right. That's from the secretary. That's correct. That's true. He would be getting both. Between what he gets from the employer and what he gets from the secretary. Correct, correct. But it may be of such duration that it would not cover the necessary time period of his vocational rehabilitation. That would vary case by case. Does the scheduling of injuries limit the time period of compensation as well? Well, how long you're going to get your scheduled award depends upon the extent of your disability for a scheduled injury. If it's permanent? If it's permanent. So, in other words, if you have a 1% disability of your knee, you're going to get a payment over a relatively short period of time. But if it's a 50% disability of the knee, you're going to get a payment over a much longer period of time. What was it in this case? 17%. For what period of time? It's then paid out over, and I can't remember the number of weeks, but it was 17% of the leg. So that's paid out over the 200-plus weeks. What's the difference between a scheduled and an unscheduled injury? Body part. If it's any appendage, it's a scheduled injury. Any other part of the body is an unscheduled injury. So this is a scheduled injury? This is a scheduled injury. That's correct. What do you see? You covered this, but it slipped by me. What do you see as the basic problem with your opponent's reliance on PEPCO? Well, I think the bottom line is that it's going to create a situation where individuals who have scheduled awards are not going to be able to have vocational rehabilitation programs ordered by the secretary in any sort of effective or meaningful manner. Most cases, they will opt not to do those vocational programs, primarily because they won't receive compensation during the extent of the program. His argument is based on the words of the case, which was based on the words of the statute. So don't you have to walk around the case and not talk about the result? In other words, how do you get around PEPCO, given the analysis of the court? I think PEPCO, well, I think the distinguishing fact about PEPCO, it has nothing to do with vocational rehabilitation. It has to do with what type of, how we're going to pay individuals when they have a scheduled injury. And they weren't looking at it in the context of how vocational rehabilitation plays into this. And clearly, vocational rehabilitation not only has a physical aspect to it, what is a person's disability, but also what is the economic impact on them. If they can't work while they're in a vocational program, that has an economic impact on them. What about opposing counsel's position that the employer can voluntarily assume that obligation? The employer voluntarily assumes that obligation typically in unscheduled injury awards, where they want to try to maximize an individual's wage earning capacity, so that they reduce their long-term need to pay loss of wage earning capacity under unscheduled injury. So it's in their economic advantage long-term to do that. And that incentive does not exist in a scheduled injury? It doesn't exist per each specific employer in any particular case, if the individual has already reached maximum medical improvement. If they haven't reached maximum medical improvement, the sooner they can get them vocationally trained, they have that advantage, then to get them back to work sooner as opposed to later. But it certainly benefits society and all employers, the workers' comp system generally. All right. Thank you, counsel. Thank you. Good morning. Good morning. My name is Peter Silvina. I'm here on behalf of the Director of the Office of Workers' Compensation Programs. I'd like to start out by strongly disagreeing with what the employer has said that the Supreme Court held in the PEPCO case. And he has quoted some language to this Court, which I do not believe fully encompasses what the Supreme Court considered. I'd like to draw the Court's attention to page 279 of the PEPCO case, specifically footnote 17. In the case, the Court states that the opinion in Jones, however, does not address the exclusivity issue presented in this case. Rather, Jones held merely that a scheduled injury can give rise to an award for permanent total disability under Section 8A, where the facts establish that the injury prevents the employee from engaging in the only employment for which he is qualified. This conclusion is entirely consistent with the statute, which in Section 8A, directs that permanent total disability shall be determined in accordance with the facts. Indeed, since the 8C schedule applies only in cases of permanent partial disability, once it is determined that the employee is totally disabled, the schedule becomes irrelevant. Specifically, the Court conceived of the fact that a scheduled injury may amount to a total disability. In this case, the question was whether or not you could look at, in the alternative to the scheduled award, whether or not alternatively you could look at whether the loss in wagering capacity was greater and award alternative benefits. Are you saying that this case involves a total disability situation? Yes, Your Honor, it does. The way this Court specifically has set out the test, this Court has set up a factual determination. The way total disability works under the statute is the first examination. And this is in the ---- I'm confused. I thought he was paid on a permanent partial disability. He is. But the real ---- that determination, as the Supreme Court has noted, comes later in the case. The first question ---- You're talking about the time while he's on vocational rehabilitation. During the period ---- That's the time he's totally disabled. He's totally disabled. And this Court, in the Edwards case, recognized that there is a shifting burden to determine total disability. First, we examine whether or not the claimant can perform their former position. In this case, it is undisputed that the claimant could not. The burden then shifts to the employer to show suitable alternative employment. What the courts did in Abbott, Brickhouse, and arguably in Pepco, they considered the fact whether or not factual determinations could make the employer unable to show suitable alternative employment. In Edwards, this Court considered factors such as the claimant's education, such as the claimant's age, such as the claimant's disability. These are all factors in whether or not the employer can make a showing. What the Abbott Court did was not create some new form of benefits, but instead what they did was add the vocational rehabilitation determination as a factor to consider whether or not the employer can show suitable alternative employment. Is the employer actually given an opportunity to make that showing, or is this kind of theoretical? No, absolutely. The employer can make that showing for the ALJ before they have to pay a penny of permanent total disability benefits. Is that done in this case? Yes, Your Honor. The ALJ specifically went through the entire Abbott test. The district director never determines that the employer... I thought you said this test was under Pepco. The test, that's my quote with Pepco, that's from Abbott and Brickhouse. Pepco, specifically, they did consider, and the Supreme Court noted that you can have total disability findings in a scheduled injury case. They didn't deal with the vocational rehabilitation issue. But I would call the court to that quote. Your Honor, the court in the Edwards case, this court has specifically dealt with many factual considerations that have to be determined before you can look at whether or not a claimant is totally disabled or partially disabled. For the employer to state that in the Pepco case, that they strictly ruled that you could not award these types of benefits is not correct. With regard to the employer's arguments regarding the statutory history of its failed amendments, we'd also draw the court's attention to the difference between what was considered in those amendments and what is actually in place in the statute. Not only was it a different type of benefits that Congress considered. In fact, if you'll look at the statutory history of the LCA and the employer both provided, you'll note every time that Congress considered something, it was for temporary total disability benefits. What we are talking about specifically in this section is 8A, which is permanent total disability benefits. These occur at two separate times. The legislative history, as the Supreme Court has cautioned, is very dangerous to look at not enacting changes to the statute and try and make presumptions from what Congress intended from not enacting things. Are you saying that in those discussions, in those considerations of amendments in Congress, they were not dealing with temporary total disability benefits? They were not dealing with permanent total disability benefits, which is what we have here. Specifically, Your Honor, on every occasion that they have referenced the history, they were considering temporary total disability benefits. But isn't that what we're dealing with here? No, Your Honor. Temporary total disability during the vocational rehabilitation period. Your Honor, although it would seem that that is a temporary period, as Justice White pointed out in the Abbott case, as the statute specifically provides, the period of time is for permanent total disability benefits because it occurs after maximum medical improvement occurs. If you look at the language of Section 39C2 of the Act, you'll note that the Secretary is only allowed to institute vocational rehabilitation on permanently disabled employees. Those are under 8A. So what happens when the vocational rehabilitation is completed? It goes back to partial? Or in the case of a scheduled injury, it would pay out for the period of time. Okay, so when we say permanent, we don't really mean permanent. Correct, Your Honor. Permanent for the period of vocational rehabilitation. If I could. Then the other alternative approach kicks in. We have had to change the rational meanings, unfortunately, of certain words in the statute. Yes, that's not very helpful. Under Section 8A of the Act, permanent disability is not thoroughly defined. There are certain instances where a claimant loses both legs, both arms, both eyes, where it's automatically permanent total disability. Sounds a little like Gilbert and Sullivan. Yes, unfortunately, Your Honor. On other occasions, specifically the Act sets out that it shall be determined based on the facts of the case. This Court has examined it. The Fourth Circuit, the Fifth Circuit, the Second Circuit, have all discussed what the facts of the case mean in terms of permanent disability. And they've created the shifting burdens test. The ALJ went through the shifting burdens test and found that the employer could not reasonably show that the claimant was available for their light-duty proposed jobs because they were working full-time in vocational rehabilitation. When you take that in concert with the mandate that's given to the secretary to direct vocational rehabilitation and the importance of that goal, it's clear that that's a factor that should be considered by the Court to determine whether or not the person is permanently disabled. I'll ask you the question that I asked your co-counsel. Was any consideration given to the short portion of the regulations that talks about designing vocational rehab? Absolutely, Your Honor. In the record before the Court are extensive documents by Mrs. Williams and by the district director, and that's a consideration of a short program. This individual had worked in heavy, hard labor for his entire life and now could no longer do those types of positions. And they looked at a reasonably short position which would return his long-term wage earning capacity and act in his best interest. Justice White considered a very similar issue in the Abbott case where we were talking about a four-year vocational rehabilitation period. And he said, and I'm paraphrasing, that although he might not consider four years to be a short period, he did not want to interfere with the district director's vocational rehabilitation in light of the mandate given to the secretary under 39C2. I see my time is just about run, Your Honor. Are there any more questions? It appears there are none. Thank you. Thank you very much. Thank you, Your Honor. A short period was not considered for vocational rehabilitation for Mr. Castro. The vocational consultant who put together the plan did not consider any type of employability without a retraining program. In fact, employability had already been established. The shifting burden scheme had already been satisfied by my client by finding jobs within Mr. Castro's age, education, and work limitations. And those jobs were identified both before and after this vocational program began. But this vocational consultant had a single-minded purpose to find a program to put Mr. Castro into. It's an important fact. Mr. Castro was receiving permanent partial disability under the schedule throughout most of this program. It's an important fact that Mr. Castro had a private disability plan that paid him $500 a month during rehabilitation. Mr. Castro had no interest in looking for the jobs. In fact, he applied for none of the jobs identified by my client. Wasn't that evidence that was brought up before the ALJ? It was, but it was never considered. But you had the chance to make that point. I did make the point to the ALJ. I made the point to the BRB. And neither the ALJ nor the BRB considered Mr. Castro's motivations in all this. And what's your position regarding the effect on the appeal if those entities did not consider that evidence? That the issue remains for the court to consider or perhaps remand back to those entities. What's your case authority for that proposition that if evidence goes unaddressed by the administrative agency, then it's ripe for remand, for reconsideration? What case are you citing for that proposition? Your Honor, I'd be happy to supplement the record with a case of that nature. Well, if you were making the argument, I was assuming there was a case behind the argument. I understand that there are many. Often, and it's not at all uncommon for cases to be remanded for further adjudication when an issue was missed by an administrative law judge. And that's very common. Even if Abbott applies here, one of the core requirements of Abbott for paying this total disability during rehab is that the individual is not employable during the rehab. But, in fact, Mr. Castro was required to work, as part of his program, 700 hours. And, in fact, by the time of the formal hearing, he had worked 80 hours and had received, I believe, $7.50 an hour at a Marriott hotel. This program was to be a hotel clerk for his efforts. By definition, this case should not be an Abbott-type case because not only was he required to work, he did work, and he was paid to work. I thought the reason that he was given total disability compensation during rehabilitation was because he didn't have enough time to take on a full-time job because of the time it took to go to school. Well, the rehabilitation program had within its time boundaries. Mr. Castro lives on Bainbridge Island, which is 10 miles across from downtown Seattle. He would come in town for rehabilitation. In fact, that's where he would work if he worked at one of the bigger hotels in the region. And his argument was that he could not do the jobs that we had already identified before he started this program because of these time constraints at the time it took to study. Well, within the time constraints of the program would be the 700 hours of work. By definition, Abbott does not apply in this case. Even if the court finds that Abbott is good law for one of these scheduled injury cases, if the court disregards PEPCO, by definition, it doesn't. This man was required to work. But this was all considered at the administrative level, right, and rejected? It was considered, I think, would be giving too much credit to the consideration from the standpoint of my client. This is a core fact that was overlooked in this case. The procedure that we are supposed to – the director says, well, we had our opportunity to object to the formation of the program when it was before the OWCP, and we should have appealed that program to the Benefits Review Board. Well, we didn't. There's no procedure at the OWCP level to have any input at all into a program. In fact, the program itself, on all elements of it, according to the regulations, are private, and we are not allowed to even know about the program by the privacy statute and the regulations. Now, that made sense in the way that the programs were developed before Abbott came along, but now that we have a vested interest in – and we employers have a vested interest in how much we're going to have to pay during this program, which was never the case before Abbott, I believe there needs to be some sort of procedure. What do we appeal? Is there an order? There's no order. When do we appeal? We don't know. What happened during the rehab program? It's entirely up to the OWCP to reveal it to us, but by operation of the regulations, it's secret. So we were denied due process. We were denied a hearing under Section 19 of the Longshore Act, and in all these respects, we ask that the court reverse the finding that this gentleman is in total disability during rehabilitation. I won't refer to the average weekly wage. If you could wrap up in the next 30 seconds. Yes. Well, the point that I haven't touched on is average weekly wage, and that's the Matulak case. And the Guthrie case, which was also scheduled today to be heard, also had the same or similar average weekly wage case. And the court has asked that that case be submitted on brief, and it has been. I note that the SSA v. Arrow Price case, which also has an identical average weekly wage issue, and essentially attacking the Matulak opinion, has perhaps on appeal to the Supreme Court they've asked for a petition for writ to be granted on the average weekly wage issue. I will just say that the Ninth Circuit stands alone in its approach to average weekly wage. And in this case, the Matulak calculation of Mr. Castro's average weekly wage overcompensated him 40 percent on his weekly benefits. I understand your argument. Thank you to both counsel. The case just argued is submitted for decision by the court. The next case on calendar for argument is Worth v. Cook. Thank you for watching.
judges: T.G. Nelson, Rawlinson, Pollak